UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALBERT HARTZOG,                              **No. 05-CV-0554(VEB)**
                                             **DECISION AND ORDER**
                    Petitioner,

        -vs-

MICHAEL RABIDEAU,

                    Respondent.

_____

## I.      Introduction

*Pro se* petitioner Albert Hartzog ("Hartzog" or "Petitioner") has filed a petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254[1] challenging the constitutionality of his state-

custody as a result of a judgment of conviction entered October 17, 2002, in New York State

Supreme Court (Monroe County). Hartzog was convicted after a jury trial of one count of

Criminal Possession of a Controlled Substance in the Third Degree (New York Penal Law

("P.L.") § 220.16(1)),[2] one count of Criminal Possession of a Controlled Substance in the Fifth

Degree (P.L. § 220.06(5)),[3] and of one count of Loitering in the First Degree (P.L. § 240.36)[4].

_____

[1]         The parties have consented to final disposition of this matter by a magistrate judge pursuant to 28
U.S.C. § 636(c)(1).

[2]         "A person is guilty of criminal possession of a controlled substance in the third degree when he
knowingly and unlawfully possesses: 1. a narcotic drug with intent to sell it . . . ." N.Y. PENAL LAW § 220.16(1).

[3]         "A person is guilty of criminal possession of a controlled substance in the fifth degree when he
knowingly and unlawfully possesses: . . . 5. cocaine and said cocaine weighs five hundred milligrams or more." N.Y.
PENAL LAW § 220.06(5).

[4]         "A person is guilty of loitering in the first degree when he loiters or remains in any place with one
or more persons for the purpose of unlawfully using or possessing a controlled substance, as defined in section
220.00 of this chapter [i.e., N.Y. Penal Law § 220.00]." N.Y. PENAL LAW § 240.36. "The gravamen of Penal Law

-1-

Briefly stated, the proof introduced by the prosecution at trial was that on February 16, 2002 at about 5:00 p.m., police officers were conducting surveillance on a Rochester intersection identified as a known "open drug" area. Petitioner was standing in the same location for a while, as various individuals were coming and going. One officer witnessed Petitioner make a furtive exchange of something for money; he thereafter got into his car, where he stayed for a couple of minutes, and then returned to his station on the street corner. Based upon his training and experience, the narcotics officers concluded that Petitioner was selling drugs. A uniformed officer was directed to arrest him on a charge of loitering. Upon searching his person, the police found over one hundred dollars in small denominations. An inventory of his car revealed fourteen packages of cocaine.

Hartzog was adjudicated a second felony offender and sentenced to indeterminate terms of imprisonment of five to ten years on the third degree possession conviction. He received three and a half to seven years on the criminal possession of a controlled substance in the fifth degree charge, and he received an unconditional discharge for his loitering first degree conviction. All sentences were set to run concurrently.

Hartzog was unconditionally released from Groveland Correctional Facility on September 16, 2005. The notation in the "latest release date/type" field is "9/16/05 SUPPLMNTAL MERIT - OTHER". *See* http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (last accessed May 12, 2010). It also appears that Hartzog has been finally discharged from parole

240.36 is found in the words 'for the purpose of . . . using or possessing' a controlled substance[.]" *People v. Reynolds*, 136 Misc.2d 307, 308, 518 N.Y.S.2d 551, 552 (N.Y. Crim. Ct. 1987) (citation and quotation omitted).

supervision, as the notation under "parole discharge date" is "9/19/2007". According to the website, this indicates the parolee has been discharged from parole supervision before the maximum expiration date or the maximum expiration date for parole supervision, and the parolee's sentence is deemed completed as of this date. *See*

http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (last accessed May 12, 2010).

## II.    Jurisdiction

### A.    "In Custody" Requirement

"The federal habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Maleng v. Cook*, 490 U.S. 488, 491, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (quotation omitted); citing 28 U.S.C. § 2254(a) (emphasis in original); *see also Carafas v. LaVallee*, 391 U.S. 234, 238, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) ("The federal habeas federal habeas corpus statute requires that the applicant must be 'in custody' when the application for habeas corpus is filed.").

Once the petitioner has satisfied the "in custody" requirement, jurisdiction is not thereafter defeated by petitioner's subsequent release from custody. *See Carafas v. LaValle*, 391 U.S. 234, 237-38 (1968) ("[W]e conclude that under the statutory scheme [for federal habeas], once the federal jurisdiction has attached in the District Court, it is not defeated by the release of the petitioner prior to completion of proceedings on such application."). Here, when he filed the present habeas corpus petition, Hartzog was physically in the custody of respondent, as he was incarcerated. Therefore, he met the "in custody" requirement. *See id.* The fact that, during the

pendency of this petition, he was unconditionally released from parole supervision, is of no moment with regard to determining whether the "in custody" requirement of 28 U.S.C. § 2254(a) has been met. *Accord*, *e.g.*, *Crescenzi v. Supreme Court of the State of New York*, 749 F. Supp. 552, 554 (S.D.N.Y. 1990) (citing *Carafas*, 391 U.S. at 237-38)..

**B.      Justiciability**

Article III, Section 2 of the United States Constitution establishes the scope of federal courts' jurisdiction, which includes "all Cases . . . arising under this Constitution . . . [and] Controversies to which the Untied States shall be a Party. . . ." U.S. Const. Art. III § 2, cl. 1. The Supreme Court has stated that "[t]the Constitution's case-or-controversy limitation on federal judicial authority . . . underpins . . . our mootness jurisprudence. . . ." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoted in *Burnett v. Lampert*, 432 F.3d 996, 999 (9th Cir.2005)). "Mootness is jurisdictional[,]" which "'means that, throughout the litigation, the plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." ' " *Burnett*, 432 F.3d at 999 (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990))). As the Supreme Court has explained, "where the issues presented by a party in an action are no longer 'live,' or the party lacks a legally cognizable interest in the outcome, the federal action is properly dismissed as moot." *Spencer*, 523 U.S. at 7 (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). A federal court may consider *sua sponte* matters that touch upon the court's subject matter jurisdiction. *McGinty v. New York*, 251 F.3d 84, 90 (2d Cir.2001) (citing *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir.2000)).

In the context of federal habeas petitions challenging the validity of a state court conviction, the "case-or-controversy" requirement of Article III is typically satisfied because the prisoner's incarceration constitutes a concrete injury, caused by the conviction and redressable by reversal of the conviction. *See*, *e.g.*, *Maleng v. Cook*, 490 U.S. 488, 490-91 (1989) (*per curiam*); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.") (quoted in *Burnett v. Lampert*, 432 F.3d at 999). A habeas petition challenging a criminal conviction "is not necessarily mooted when the petitioner is released from prison, as collateral consequences of that conviction may still impinge on the petitioner post-release, and therefore a case or controversy may continue to exist." *Perez v. Greiner*, 296 F.3d 123, 125 (2d Cir. 2002) (citing *Pollard v. United States*, 352 U.S. 354, 358 (1957)).

Although collateral consequences can be presumed when challenging a felony criminal conviction, *Sibron v. New York*, 392 U.S. 40, 54-56 (1968), federal courts have held that no such presumption applies when a defendant contests a different aspect of a proceeding relating to his criminal conviction. *See Spencer*, 523 U.S. at 13, 118 S.Ct. 978 (declining to presume collateral consequences from the findings of a parole board revoking parole on the basis that the petitioner had committed forcible rape, that he used or possessed drugs, and that he used or possessed a dangerous weapon)). "In the absence of a presumption of collateral consequences, [a habeas petitioner] bears the burden of demonstrating collateral consequences sufficient to meet Article Ill's case-or-controversy requirement." *United States v. Probber*, 170 F.3d 345, 348 (2d Cir.1999) (citation omitted). Here, Hartzog's habeas petition challenges the constitutionality of his state-

court felony conviction, and accordingly he is entitled to the *Sibron* presumption of collateral consequences. Therefore, his habeas petition still presents a live controversy amenable to review by this Court. *See Spencer*, 523 U.S. at 7-8 (citing *Sibron*, 392 U.S. at 55-56). His unconditional release from incarceration and termination of his parole supervision has not mooted his habeas petition.

For the reasons that follow, Hartzog's petition is dismissed.

**III.    Factual Background and Procedural History**

**A.    The Trial**

On February 16, 2002 at about 5:00 p.m., Rochester Police Department Officer Joseph Briganti was stationed in an unmarked car conducting a surveillance of the corner of Jefferson Avenue and Champlain Street in the City of Rochester. T.151.[5] This particular location was a storefront. T.154. Several individuals were seen coming and going during the thirty minute period of observation, but the officer's attention was drawn to Petitioner, who was clad in an orange jacket. Petitioner stood by himself on the corner during the entire period that Briganti was conducting surveillance. T.153.

Briganti saw a man dressed all in brown approach Petitioner, who was still standing on the corner. T.156. The man in brown appeared to know Petitioner. T.167. According to the officer, the two men hugged each other, and began to walk together on Champlain Street toward the rear of the store, conversing with each other. T.156. At this time, the officer was positioned about twenty feet away from the two men. There were no street lights in the area, and it was starting to get dark outside. T.164-165.

---

[5]    Citations to "T.___" refer to pages in the transcript of Petitioner's trial.

Officer Briganti testified that despite the distance between him and his subjects, and the relatively low light, he was able to observe currency in the right palm of the man in brown as he walked around the corner onto Champlain Street. T.169. The man in brown handed this money to Hartzog, who appeared to hand something back; however, Officer Briganti was unable to see any object in Hartzog's hand. T.157. The officer could not hear what was being said between the two men. T.166. After about one minute, the man in brown left the area. T.158. He was not stopped by any of the police officers assigned to this surveillance team, and thus he was not searched for evidence to support the officer's subsequently stated opinion that he had witnessed a drug transaction between the two men. T.170, 174-175. The police saw Hartzog walk over to a parked car, get into it, stay a couple minutes and then return to his station on the corner.

Officer Briganti testified that he was in radio contact with his surveillance team, and that he was broadcasting his observations of this meeting as it was occurring. T.159. Sergeant McDonald, his supervisor, was listening from a short distance away, but could not see the corner where the defendant stood. T.196, 203. Sergeant McDonald ordered that Hartzog be arrested for loitering by a uniformed officer, and Hartzog was placed under arrest by Officer Jeroy. T.197, 213. The officer found that Hartzog had on him $112 in cash, in small denominations, and a set of car keys. T.214. The police performed a warrantless search of Hartzog's car and found 14 small plastic bags , T.219-20, which ultimately were tested and alleged to contain more than 500 mg. of cocaine, T.237-38.

Officer Briganti was allowed, over objection, to testify as to his opinion that Mr. Hartzog had sold narcotics to the man in brown during their meeting on the street. T.175. His supervising officer, Sergeant McDonald, also was testified that, although he did not see Petitioner or the

alleged encounter with the man in brown, he believed Petitioner engaged in a narcotics sale, based on Officer Briganti's radio transmissions describing his observations. T.197. On summation, the prosecutor relied upon the opinion testimony of both Officer Briganti and Sergeant McDonald that Petitioner engaged in a narcotics sale with the man in brown, to argue that she had proved Petitioner's intent to sell cocaine. T.270-72.

On his summation, defense counsel asked the jury to consider the paucity of evidence admitted to prove weight of the alleged cocaine, which was an element of Count Three of the Indictment. T.264-65 (Defense counsel: "The law says it's got to be more than 500. That's what it was. Was it 501? Was it 3000? It seemed like a very vague response to me, from a lab technician, from an expert. The question is, as a juror, does that raise a doubt with you why you weren't furnished with a laboratory reports. Lab technicians prepare reports. Even the sergeant said he sees these reports all the time."). The prosecutor objected to his comments, and the trial court sustained the objection as to "[t]he sergeant." Defense counsel sought clarification, and then the prosecutor further objected on the basis that a "laboratory report would be hearsay" and the chemist "could have been cross-examined by defense counsel." *Id.* Defense counsel asserted, "I have no obligation to do anything, Judge." *Id.* Although the trial court agreed that defense counsel's statement was "correct", it nevertheless sustained the prosecutor's original objection. T.265. Defense counsel did not register a further objection.

### B.    Sentencing and Appeals

Hartzog was convicted on all counts of the indictment. He was sentenced by the trial court as a second felony offender to a term of five (5) to ten (10) years in the Department of Corrections.

### C.     The Federal Habeas Petition

In his Petition, Hartzog asserts the following grounds for habeas corpus relief: (1) the trial court erred by allowing two police officers to offer an expert opinion as to whether the exchange between Petitioner and the man and brown constituted a drug sale; (2) the evidence was legally insufficient to support his convictions; and (3) the prosecutor committed misconduct during summation.

## IV.     Discussion

### A.     Standard of Review

Hartzog's petition is governed by 28 U.S.C. § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act ("AEDPA") in 1996. To obtain habeas relief under AEDPA, where the state court has adjudicated a petitioner's federal constitutional claim on the merits, a petitioner must demonstrate that the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76  (2000).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quotation omitted). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 412-13 (O'Connor, J., concurring and writing for the majority in

this part). The "unreasonable application" clause is applicable when "the state court identifies the correct governing legal principle from this Court'' decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

### B. Exhaustion and Procedural Default

It is well established that "a state prisoner must present his claims to a state supreme [i.e., the highest] court in a petition for discretionary review in order to satisfy the exhaustion requirement." *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-40, 119 S.Ct. 1728, 173 (1999); *accord*, *e.g.*, *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir.), *cert. denied*, 546 U.S. 889, 126 S.Ct. 215 (2005). In other words, as the Second Circuit, has explained, determining whether a claim has been exhausted involves a two-step analysis:

> First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . . Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

*Klein v. Harris*, 667 F.2d 272, 274 (2d Cir. 1981).

Hartzog's claims of procedural misconduct and legal insufficiency of the evidence are unexhausted because he failed to present either of them to the "highest court from which discretionary review is possible", the New York Court of Appeals, in his letter application seeking leave to appeal. He thus failed "[t]o fulfill the exhaustion requirement, [which means that] a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'" *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436 (1995). Because this Court finds that Hartzog's prosecutorial misconduct and "insufficiency of the evidence" claims are unexhausted since he did not raise them in his leave application to the New York Court of Appeals, the Court need not address whether Hartzog's Appellate Division brief "fairly presented" these claims in federal constitutional terms. *E.g.*, *Jamison v. Berbary*, No. 01 CIV.5547 RMB AJP, 2002 WL 1000283, at *16 & n.23 (S.D.N.Y. May 15, 2002).

Under former New York Court of Appeals Rule 500.10(a), New York "permit[ted] only one application for direct review[.]" *Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir. 2000) (quoting N.Y. CT. APP. R. 500.10(a) (1999)). The rule has since been amended, and criminal leave applications are now addressed in N.Y. Court of Appeals Rule 500.20. *Colon v. Connell*, No. 07 Civ. 7169(BSJ)(JCF), 2009 WL 2002036, at *6 n.4 (S.D.N.Y. July 9, 2009) While this section does not specifically state that there may be only one application for appeal, *see* N.Y. CT. APP. R. § 500.20, "such a restriction may be inferred." *Colon v. Connell*, 2009 WL 2002036, at *6 n.4. First, N.Y. Court of Appeals Rule 500.20(d) and C.P.L. § 460.10(5) provide a 30-day window for any such application to be filed, and "this time limit would be meaningless were multiple applications permitted." *Colon*, 2009 WL 2002036, at

*6 n.4. Second, N.Y. Court of Appeals Rule 500.20(d) provides that a request for reargument or reconsideration of an appeal may not raise any new points, implying that a wholly new request for leave to appeal would be impermissible. *Colon*, 2009 WL 2002036, at *6 n.4 (citing *Roa v. Portuondo,* No. 02 Civ. 6116, 2007 U.S. Dist. LEXIS 74387, at *32-33 (S.D.N.Y. Oct. 5, 2007) (declining to review issue that petitioner had failed to raise on direct appeal); *Murray v. Williams*, No. 05 Civ. 9438, 2007 WL 430419, at *8 (S.D.N.Y. Feb.8, 2007) (same); *Oquendo v. Senkowski*, 452 F. Supp.2d 359, 368 (S.D.N.Y.2006) (same)); *see also Harden v. LaClaire*, No. 07 Civ. 4592(LTS)(JCF), 2008 WL 783538, at *14 & n.12 (S.D.N.Y. Mar. 26, 2008) (same), *report and recommendation adopted*, *Harden v. LaClaire*, 07CIV4592LTSJCF, 2008 WL 4735231 (S.D.N.Y. Oct. 27, 2008).

Were Hartzog to seek collateral review in state court of the prosecutorial misconduct and insufficiency of the evidence claims by means of a C.P.L. § 440.10 motion to vacate the judgment, the court would be mandated to deny the claims pursuant to C.P.L. § 440.10(2)(c) (mandating dismissal of claim if it could have been raised on direct review but was not).

When further state court review of unexhausted claims clearly would be barred by procedural default, the habeas court may deem the claims to be exhausted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *see also Spence v. Superintendent, Great Meadow Correctional Facility*, 219 F.3d 162, 170 (2d Cir.2000); *Bossett v. Walker*, 41 F.3d at 828-29. However, the same procedural bar that results in the "constructive exhaustion" of the claims also creates a procedural default and prevents the habeas court from reaching the merits of the claims. *Bossett*, 41 F.3d at 829.

Although these claims are procedurally barred, Hartzog can overcome the procedural bar

if he can either (1) demonstrate that the failure to consider the federal claim will result in a fundamental miscarriage of justice, specifically the conviction of an actually innocent person, or (2) show good cause for the default and that he will be prejudiced by this Court's failure to conduct habeas review of the claim. *E.g.*, *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *accord*, *e.g.*, *Reed v. Ross*, 468 U.S. 1, 11-12 (1984), I note that Hartzog has made no showing of cause for the default, and has not come forward with new evidence that he is factually innocent. The claims of prosecutorial misconduct on summation and legal insufficiency of the evidence are, accordingly, subject to an unexcused procedural default. Therefore, habeas review of them is precluded.

### C. Analysis of the Exhausted Claim Raised in the Petition

#### 1. Evidentiary Error – Admission of Police Officers' Opinion Testimony

Petitioner argues that the trial court erred (1) by allowing Rochester Police Officer Briganti to testify that, in his opinion, Petitioner sold narcotics to another individual during an encounter on a city street; and (2) by allowing Briganti's supervising officer, Sergeant McDonald, who had not been present on the scene, to testify that in his opinion the encounter was a drug transaction. *See* T.175-76. Petitioner contends that these erroneous evidentiary rulings resulted in prejudice so substantial that he was deprived of his constitutional right to a fair trial. *See* U.S. Const. amends. V and XIV.

##### a. Officer Briganti's Opinion Testimony

At trial below, Rochester Police Officer Joseph Briganti testified for the People with respect to his observations of the corner of Jefferson Avenue and Champlain Street on February

16, 2002 at about 5:00 p.m.  T.151. Officer Briganti, alone and in an undercover automobile, was performing surveillance because he claimed that this street corner was an open area drug location. T.152-53.  Initially, the officer saw five or six individuals in the area, but over a period of about fifteen minutes he observed only one person was consistently present at the corner. T.153. That individual was dressed in an orange jacket, T.153) and was subsequently identified as Hartzog, T.160.

Officer Briganti then moved his car to a better vantage point and continued to observe Hartzog for another fifteen minutes. T.154. At that time, the officer observed a man dressed all in brown walk north to the corner of Jefferson. He approached Petitioner, they hugged, and had a brief conversation. T.156. Officer Briganti could not hear what was said between the two men. T.166.  Hartzog and the man in brown walked west down Champlain Street toward the rear of the store. T.156. Although the light was fading (it was about 5 p.m. in February), T.157, and he was twenty to thirty feet away from the two men, T.169, Officer Briganti claimed that he could see currency clutched in the right palm of the man in brown, T.169.

According to Officer Briganti, Petitioner handed something to the man in brown, after which the man in brown gave Petitioner some money. T.157. Officer Briganti testified specifically that he was not able to see what, if anything, Hartzog handed to the man in brown. *Id.* Petitioner points out that there was no testimony as to the number of bills or the particular denominations of the currency Officer Briganti claimed to observe.

The man in brown thereafter left the area. T.158. He was never stopped by any police officer, nor was he searched, nor was any alleged controlled substance located on his or tested to determine if it was a controlled substance. T.170.

-14-

Hartzog walked away from the corner to a silver car that was parked nearby. He sat in the car for a short time, then exited and started walking southbound on Jefferson Avenue. T.158. He was arrested within two minutes of this supposed exchange between him and the man in brown on Champlain Street. T.179. The police searched Petitioner at the time of his arrest, but found no controlled substances on his person. T.214.

At trial, the following exchange took place between the prosecutor and Officer Briganti during re-direct examination:

> Q. Could you describe how, what you observed, how the handing about came, what it looked like, how he handed the object to the man wearing brown, what do you recall, I mean, where did he get this object?
> A. He got it from his pants pocket, his right pants pocket.
> Q. He put it out, straight out in front of him?
>
> A. No.
> Q. How did he hand it to the man wearing brown?
> A. He just reached out, just reached out like that, and handed it to him (indicating).
> Q. Was his hand covering it, the object?
> A. It was in his hand. I couldn't see where it was.
> Q. What did you see the man wearing brown do?
> A. He took it. I don't believe he put it in his pocket. I believe he held it in his hand and then just reached over and gave him money.
> Q. And had you seen this type of transaction prior to September 16th?
> A. Yes.
> Q. And based on your training and experience, what did you believe occurred?
> MR. SCARDINO: Objection.
> THE COURT: No, overruled.
> A. I believed it was a narcotics sale.
> Q. And why are you saying that?
> A. Just the fact that the gentleman had money in his hand plus the two gentlemen went to a location in order, it looked to me, like to conceal themselves from the high level of traffic on Jefferson Avenue, hence alongside the store. It was just real quick.
> Q. Based on your training and experience, who did you believe to be the buyer?

| A. | I believed the gentleman. |
| | MR. SCARDINO: I'm sorry? |
| Q. | Based on your training and experience, who did you believe to be the buyer? |
| | MR. SCARDINO: Objection. It's completely conjecture, Judge. |
| | THE COURT: No, overruled. |
| A. | I believed the buyer to be the gentleman in brown. |
| Q. | Why was that? |
| A. | Because he had money in his hand. |

T.174-175.

Officer Briganti had no direct knowledge as to whether Hartzog had engaged in a drug transaction with the man in brown. He did not see Hartzog hand over anything that resembled a controlled substance by its appearance, size or packaging. In fact, Officer Briganti could not see what, if anything, Hartzog handed to the man in brown. All he could really say was that Hartzog's actions seemed to indicate that he was handing something to the man in brown, and the man in brown was handing currency to Hartzog.

Defense counsel argued that Officer Briganti could not say why this was occurring, although clearly he surmised that it was a sale of narcotics. Defense counsel contended that without seeing what Hartzog allegedly handed over; and without stopping the alleged buyer (i.e., the man in brown), searching him, seizing the object, testing the object, and obtaining inculpatory statements from the alleged buyer, it was no more than a guess. However, the trial court allowed ultimately Officer Briganti to testify as to his mere opinion as to the nature of Hartzog's meeting on the street with the man in brown.[6]

---

[6] The Court agrees with Hartzog that defense counsel's argument has force. Indeed, the Court believes that even if probable cause to arrest was established here, it was by a very slim margin. *Cf. People v. Thompson*, 4 Misc.3d 126(A), 791 N.Y.S.2d 872, 2004 WL 1433652, at *1 (Table) (N.Y. Sup. Ct. App. Term June 9, 2004) (unreported disposition) (reversing conviction and granting motion to suppress based on lack of probable cause where the arresting officer observed defendant at 7:30 P.M., on a July evening, speaking with another person

### b.      Sergeant McDonald's Hearsay Testimony

As Officer Briganti sat watching  Hartzog on the corner of Jefferson Avenue and Champlain Street, he was broadcasting his observations over the police radio. T.159. His supervisor, Sergeant McDonald was monitoring the broadcasts from his position further east on Champlain Street. T.196-97. Sergeant McDonald could not see the corner of Jefferson Avenue and Champlain Street, nor could he see Hartzog at the time. T.196, 203. Sergeant McDonald concluded that a narcotics crime had occurred, and, as supervisor of the operation, directed a uniform officer to arrest Hartzog. T.197.  McDonald then proceeded to the intersection of Jefferson Avenue and Champlain Street, where he observed Hartzog for the first time, as Hartzog was exiting an automobile. T.197.

Sergeant McDonald testified on direct examination regarding his decision to arrest Petitioner as follows:

---

on the sidewalk in a drug-prone location and engage that person in what the officer, an experienced investigator of narcotics transactions, could characterize only as some sort of exchange, without observing the transfer of currency or any identifiable object bearing the 'telltale sign' or 'hallmark' of an illegal substance, such as the manner in which such substances are packaged") (citations omitted); *People v. Oreste Aguiar*, May 15, 1998, 219 N.Y.L.J. 93, at p. 35, col. 5 (Sup. Ct. Nassau Co. May 15, 1998) ("[I]t must be determined whether the predicate information possessed by the officers constituted not probable cause but merely reasonable suspicion. It is clear that White Tavern is a drug prone location and that Officer Knatz is an experienced narcotics officer. Nevertheless, the court is constrained to hold that the standard of reasonable suspicion has not been met. Although no reported case appears to deal with the precise issue, [*People v.*] *McCray*[, 51 N.Y.2d 594 (1980)] and [*People v.*] *Jones*[, 90 N.Y.2d 835 (1997)] suggest that reasonable suspicion requires the observation of the passing of some type of object. Thus, the court holds that approaches of the suspect by various people in a drug prone location, absent any observation of an exchange, give rise only to an objective credible reason to request information and an explanation of the suspect's activity. Mr. Aguiar might have been simply socializing in the bar as opposed to dealing drugs. While it is true that he was seen standing and congregating at the rear door, his behavior was innocuous. No passing of any currency or object of any kind was observed. Moreover, the officer did not see any furtive behavior by defendant or any of the supposed buyers. The court commends Officer Knatz for his candor. But, his observations gave rise merely to a basis to approach Mr. Aguiar and request information.").

The Court recognizes, however, that a Fourth Amendment issue such as this is generally precluded from federal habeas review by the Supreme Court's holding in *Stone v. Powell*, 428 U.S. 465, 481-82 (1976) (holding that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial") (emphasis supplied).

| | |
|---|---|
| Q: | Were you able to overhear what Office Briganti was observing? |
| A: | Yes. |
| Q: | And did there come a time that you made a determination to take an individual into custody? |
| A: | Yes. |
| Q: | And how did you come to that determination? |
| A: | From the descriptions of what was occurring, from what Officer Briganti was saying, of my personal experience of that area, I had determined that there was an individual who was involved in possession or trafficking of narcotics. I had informed uniformed officers that we were going to make an arrest of this individual for loitering. |

T.196-197.

According to his trial testimony, Sergeant McDonald had not observed Hartzog engage in any of the activities that ultimately led to his arrest. T.204. His decision to have a uniformed officer arrest Hartzog was based entirely on the information Officer Briganti transmitted from the unmarked car on the corner of Jefferson Avenue. T.204. Officer Briganti did not stop the man dressed in brown, and therefore did not obtain any additional proof with respect to his inference that the man in brown had purchased narcotics from Hartzog. T.210. Therefore, Petitioner argues, the testimony that Sergeant McDonald was allowed to offer was merely his personal opinion of what had occurred during Hartzog's meeting on the street with the man in brown. It was not based on anything he had witnessed, but only on hearsay statements derived from Officer Briganti's radio broadcast. Trial counsel did not object to Sergeant McDonald's testimony.

### c.    The direct appeal of these claims

On appeal, Petitioner's appellate counsel argued that the police officers (Briganti and McDonald) exceeded the permissible scope and extent of expert testimony, and invaded the province of the jury by testifying as to the ultimate issue of fact regarding the element of intent to

sell. Petitioner argued that this could not be harmless error, in light of the lack of any other evidence offered to infer intent.

The prosecution responded that Hartzog's claim of error that he was denied a fair trial because the court permitted opinion testimony by the officer as to what he witnessed was not been preserved for review since defense counsel made only a general objection when the testimony was proffered, and failed to advise the trial court that error claimed here was the basis for his objection. *See People v. Tevaha*, 84 N.Y.2d 879, 880-81 (N.Y. 1994) ("Defendant's sole claim of error–that he was denied a fair trial when the court permitted testimony by the arresting officer regarding the general practices of drug sellers–has not been preserved for our review. Defense counsel simply made a general objection when the testimony was proffered, and failed to advise the trial court that the present claimed error was the basis for his objection. The word 'objection' alone was insufficient to preserve the issue for our review .") (citation omitted). Similarly, the prosecution argued, defense counsel's later objection to the officer's testimony on the basis that it was "conjecture" was not sufficient to preserve his present contention. *See People v. Osuna*, 65 N.Y.2d 822, 824 (N.Y. 1985) ("The portion of the rebuttal testimony of the Assistant District Attorney which defendant now claims deprived him of a fair trial was not objected to at trial and is thus beyond our review. Defendant objected only to the narrative form of this witness's testimony, which was not sufficient to preserve a contention that the substance of a portion of the testimony was improper.").

Finally, the prosecution pointed out that Hartzog's contention of similar error with respect to the testimony of Sergeant McDonald, the supervising officer of the surveillance team, was unpreserved for review since no objection was lodged to that portion of his testimony question on

appeal.

The Appellate Division overlooked the apparent lack of preservation and considered the evidentiary claim as to Officer Briganti's opinion testimony on the merits, agreeing that the trial court "erred in receiving in evidence the expert opinion testimony of a police officer that defendant had engaged in 'a narcotics sale.'" *People v. Hartzog*, 15 A.D.3d 866, 867, 789 N.Y.S.2d 391, 392. The Appellate Division noted that "[a] court may properly receive opinion testimony of a police officer qualified as a narcotics expert on matters concerning drug transactions not within the common experience or knowledge of the average juror[,]" such as "expert opinion testimony concerning the quantity and packaging of drugs recovered from the defendant[, which] may be helpful to the jury in understanding whether such quantity and packaging are inconsistent with personal use and consistent with drug dealing, and expert testimony concerning the operating methods and terminology used in drug transactions and the methods used to conceal, transport and consume narcotics [which] also may be helpful to the jury in understanding the evidence presented and in resolving material factual issues[.]" *Id.* (internal citations and quotations omitted). However, "expert testimony which tends to usurp the jury's fact-finding function is inadmissible[.]" *Id.* (quotation and citations omitted). The Appellate Division found that is what happened in Hartzog's case–the trial court "erred in allowing the police officer [i.e., Officer Briganti] to testify that, in his opinion, the street exchange he observed between defendant and another individual prior to the search of defendant's car was a narcotics sale[.]" *Id.* (citations omitted).[7]

---

[7] As a matter of evidence law in the federal courts, the Second Circuit has held that "[g]enerally, the use of expert testimony is not permitted if it will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *United States v. Duncan*, 42

Nevertheless, the Appellate Division concluded, the error involving Officer Briganti's testimony was "harmless" because "there [was] overwhelming evidence, apart from the inadmissible opinion testimony, that [Hartzog] possessed the cocaine found in his car with intent to sell it." *People v. Hartzog*, 15 A.D.3d at 867. That evidence "include[d] the officer's factual description of defendant's furtive delivery of 'something' to another individual in exchange for money, the 14 separate packages of cocaine found in defendant's car, and the sum of $112 in small bills discovered on defendant's person." *Id.* The Appellate Division concluded that "because 'defendant's activities were manifest, and the evidence of his guilt [is] overwhelming, the error is harmless[.]'" *Id.* (quoting *People v. Goodwine*, 177 A.D.2d 708, 709, 576 N.Y.S.2d 881,[8] *lv. denied,* 79 N.Y.2d 920, 582 N.Y.S.2d 80, 590 N.E.2d 1208; and citing *People v. Berry*, 5 A.D.3d 866, 867, 773 N.Y.S.2d 181, *lv. denied*, 3 N.Y.3d 637, 782 N.Y.S.2d 408, 816 N.E.2d 198; *People v. Williams*, 224 A.D.2d 725, 638 N.Y.S.2d 705, *lv. denied,* 88 N.Y.2d 855, 644

---

F.3d 97, 101 (2d Cir. 1994) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991)); *accord, e.g.*, *United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006). "Clearly, an opinion that purports to explain the law to the jury trespasses on the trial judge's exclusive territory." *Stewart*, 433 F.3d at 311 (citing *United States v. Scop*, 846 F.2d 135, 139 (2d Cir.) (FED. R. EVID. 704 "was not intended to allow experts to offer opinions embodying legal conclusions"), *rev'd in part on reh'g on other grounds*, 856 F.2d 5 (2d Cir.1988)); *see also United States v. Dukagjini*, 326 F.3d at 54 (allowing a case agent who testifies as an expert to provide sweeping conclusions about a defendant's activities "may come dangerously close to usurping the jury's function") (quoting *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.1987)).

[8]     For instance, the appellate court in *Goodwine* found the defendant's drug-selling activities to be "manifest", and the evidentiary error harmless, where the circumstances were as follows: "Just after midnight on September 16, 1988, two police officers were parked in an unmarked police car approximately 50 to 75 feet from the intersection of Nassau Road and Hudson Avenue, in Roosevelt, Nassau County, New York. From the car, the officers observed the defendant and another individual standing on the corner. After about five minutes, a third man approached the defendant and, after a brief conversation, the defendant walked over to a signpost and removed a small black pouch from between the sign and the post. The defendant returned to the corner and appeared to hand something to the third man. Then, the third man inspected a clear plastic vial at eye level, placed the vial into his pocket, and walked away. The defendant then returned the pouch to the signpost. At this point, the officers exited their vehicle and approached the defendant. They retrieved the black pouch from the signpost and arrested the defendant. The officers opened the pouch and discovered 18 vials, each containing a 'white, rock-like substance'." *People v. Goodwine*, 177 A.D.2d at 708.

N.Y.S.2d 702, 667 N.E.2d 352; *People v. Ingram*, 2 A.D.3d at 213, 770 N.Y.S.2d 294).

With regard to Sergeant McDonald's testimony the Appellate Division held that Hartzog "failed to preserve for [their] review his contentions concerning the opinion testimony of the police sergeant . . . ." *People v. Hartzog*, 15 A.D.3d at 867 (citing N.Y. Crim. Proc. Law § 470.05(2)). The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) (citations & internal quotations omitted). The Appellate Division's rejection of this claim based on Petitioner's failure to comply with a state preservation rule was an independent and adequate state ground which bars federal habeas review of the claim. The Appellate Division referred specifically to New York's "contemporaneous objection" rule, embodied in C.P.L. § 470.05(2). Both the Supreme Court and the Second Circuit have held that the failure to object at trial when required by a state's contemporaneous objection rule, such as C.P.L. § 470.05, is an adequate and independent state ground. *E.g.*, *Wainwright v. Sykes*, 433 U.S. 72, 86, 90 (1977) (contemporaneous objection rule is an adequate and independent state ground); *Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999) ("We have observed and deferred to New York's consistent application of its contemporaneous objection rules . . . .") (citations omitted). Because there is an adequate and independent finding by the Appellate Division that Hartzog procedurally defaulted on his hearsay claim involving Sergeant McDonald's testimony, Hartzog would have to show in

his habeas petition "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). He has not made the required showing and this claim accordingly precluded from habeas review.

> **d.** **Habeas review of the state court's evidentiary error–the exhausted claim regarding Officer Briganti's opinion testimony**

I agree with Petitioner and the Appellate Division that the trial court erred in permitting Officer Briganti to give his opinion that the exchange he observed between Petitioner and the man in brown, prior to the officers' search of Petitioner's car, was a drug sale. As the Appellate Division found, this testimony tended to usurp the jury's exclusive role as the finder of facts. However, showing that the trial court violated this state-law rule of evidence regarding the admission of expert testimony is not, in and of itself, sufficient to demonstrate that an error of constitutional magnitude occurred at Petitioner's trial. *See, e.g.*, *Roldan v. Artuz*, 78 F. Supp.2d 260, 276 (S.D.N.Y. 2000) ("A petitioner seeking habeas relief from an allegedly erroneous evidentiary ruling bears the 'heavy burden' of establishing that the trial court's error constituted a deprivation of a constitutionally recognized right such as the right to a fair trial.") (citing, *inter alia*, *Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y. 1995), *aff'd mem.*, 71 F.3d 406 (2d Cir.1995)).

It is well settled that "[a] state prisoner is entitled to habeas relief only if he is being held in custody in violation of a federal right." *Headley v. Tilghman*, 53 F.3d 472, 474 (2d Cir. 1995) (citing 28 U.S.C. § 2254(a); *Engle v. Issac*, 456 U.S. 107, 119 (1982)). It is equally established that a state court's "[e]rroneous evidentiary rulings do not automatically rise to the level of

constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where petitioner can show that the error deprived her of a *fundamentally fair* trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (emphases in original) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973); *Lipinski v. People*, 557 F.2d 289, 292 (2d Cir.1977), *cert. denied*, 434 U.S. 1074 (1978); *Nettles v. Wainwright*, 677 F.2d 410, 415 (5th Cir.1982); *Gale v. Harris*, 580 F.2d 52, 54 (2d Cir.1978) (*per curiam*), *cert. denied*, 440 U.S. 965, 99 S.Ct. 1515, 59 L.Ed.2d 781 (1979); *accord Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'") (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted in original)).

The Second Circuit has described the notion of "fundamental fairness" a "sometimes . . . elusive one." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.), *cert. denied*, 464 U.S. 1000 (1983); *accord*, *e.g.*, *Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985). "When evidence is erroneously excluded the test for determining whether the ruling denied the defendant a fair trial is whether it would have created "a reasonable doubt that did not otherwise exist[.]" *Collins*, 755 F.2d at 18 (quoting *United States v. Agurs*, 427 U.S. at 112 and citing, *inter alia*, *Taylor*, 708 F.2d at 891). In *Collins*, the Second Circuit examined the question of whether a "different test should be applied when evidence is erroneously *admitted*, which requires [the court] to assay the probable impact of that evidence." *Id.* (emphasis in original). The petitioner in *Collins* argued that a higher level of scrutiny was required when the jury had actually been exposed to the erroneously admitted testimony than when the evidence has been excluded, and that and that the test should be whether, if the evidence had *not* been admitted, there was a significant possibility that the jury

would have had a reasonable doubt. *Collins*, 755 F.2d at 19; *see Chapman v. California*, 386 U.S. 18 (holding that on direct review of a conviction, the test for harmlessness is that there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt).

The Second Circuit disagreed, *id.*, noting that, as a federal court sitting in habeas review, it was not simply being asked to "apply rules of evidence that might permit the state court in its discretion to grant a new trial but rather [was] dealing with a more fundamental constitutional concept of fairness[,]" *id.* With that circumscription in mind, it determined that the proper standard was "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it[;] [i]n short it must have been 'crucial, critical, highly significant,'" *id.* (quoting *Nettles v. Wainwright*, 677 F.2d 410, 414-15 (5th Cir. 1982) (internal quotation marks omitted in original)).

In Hartzog's case, the state appellate court concluded that the introduction of Officer Briganti's expert opinion testimony was "harmless error" and it applied the standard adopted by the New York Court of Appeals in *People v. Crimmins*, 36 N.Y.2d 230, 237 (N.Y. 1975). *See People v. Hartzog*, (citing *People v. Goodwine*, 177 A.D.2d at 709 (citing *Crimmins*, 36 N.Y.2d at 237)). *Crimmins* decided what test was to be applied to judge constitutional error at trial, and the Court of Appeals held that "such error calls for reversal and a new trial unless it was harmless under the test for harmless constitutional error laid down by the Supreme Court of the United States, namely, that there is no reasonable possibility that the error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt[.]" 36 N.Y.2d at

237 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171).

The Second Circuit stated in *Taylor v. Curry*, a habeas case concerned with an erroneous evidentiary ruling, that its "task [was] to determine whether the exclusion of evidence was an error of constitutional dimension, not the more narrow inquiry whether a constitutional error has been shown to have been harmless beyond a reasonable doubt[.]" 708 F.2d at 891 n.6 (citing *Chapman*, 386 U.S. at 22-24). Thus, the state court, in applying the *Crimmins*/*Chapman* harmless error test applied a less stringent (to defendants) test than has been called for in cases such as this one, when the court is attempting to determine if an state-law evidentiary error at state defendant's trial warrants habeas relief, that is, whether "the error deprived [him] of a fundamentally fair trial." *Taylor v. Curry*, 708 F.2d at 891.

As noted above, this habeas court's scope of review is bounded by the "objectively reasonable" AEDPA standard. Given the ample, properly admitted evidence of Petitioner's guilt, as the Appellate Division specifically identified, I cannot on this record find that it was objectively unreasonable for the Appellate Division to have concluded that there was no reasonable possibility that the error occasioned by Officer Briganti's opinion testimony might have contributed to Petitioner's conviction and that it was thus harmless beyond a reasonable doubt. Furthermore, I must conclude that the erroneously admitted expert testimony was not "a sufficiently substantial, significant or crucial factor to have denied [Petitioner] the fundamentally fair trial required by the Due Process clause." *Collins v. Scully*, 755 F.2d at 19. "In short, [I] cannot here conclude that an 'absence of . . . fairness fatally infected the trial,'" *id.* at 20 (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)). Accordingly, habeas relief cannot

issue with respect to this evidentiary claim.

## V.    Failure to Prosecute

The Court also notes that Hartzog has failed to comply with the Western District of New York's Local Rules of Civil Procedure and has failed to prosecute this action. As a matter of this District's Local Rules, both attorneys and *pro se* litigants have an obligation to immediately notify the Court and opposing parties of any change in their address or contact information. Local Rule of Civil Procedure 5.2(d) requires that a party proceeding *pro se* "must furnish the Court with a current address at which papers may be served on the litigant. . . . . In addition, the Court must have a current address at all times.  Thus a *pro se* litigant must notify the Court immediately in writing of any change of address.  *Failure to do so may result in dismissal of the case with prejudice.*"   Western District of New York Local Rule of Civil Procedure 5.2(d) (emphasis supplied).

Although Hartzog is a *pro se* petitioner and should be afforded greater leeway in regard to his compliance with the Court's procedural rules, *see LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001), his failure to comply with rule regarding updating his address "is no small matter." *Jackson v. Rabideau*, No. 9:04-CV-1096(LEK/GHL), 2007 WL 911846, at *2 (N.D.N.Y. Mar. 22, 2007) (citing *Dansby v. Albany County Corr. Facility Staff*, No. 95-CV-1525, 1996 WL 172699, at *1 (N.D.N.Y. Apr. 10, 1996) (Pooler, D.J.) ("It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications that communications between the clerk and the parties . . . will be conducted principally by mail.") (citations and quotation omitted in

original)); *see also Michaud v. Williams*, No. 98CV1141, 1999 WL 33504430, at *1 (N.D.N.Y. Nov. 5, 1999).

Hartzog has failed keep the Court informed as to his current address at which papers may be served, and has failed to comply with Local Rule 5.2(d) and this Court's Order directing him to provide an updated address. He was released unconditionally from prison and from parole supervision months after he filed his habeas petition, and has never informed the Court of his whereabouts. As a *pro se* litigant, Hartzog received a packet of information from the District Court Clerk advising him about the requirements of all of the Local Rules of Civil Procedure, including Local Rule 5.2(d). Therefore, Hartzog has known for years that, pursuant to Local Rule 5.2(d), he *must* promptly update his address whenever it changed, or risk having the action dismissed by this Court. The Court notes that Hartzog's inaction and failure to update his address have spanned several years. It appears that Hartzog, upon being released, never contacted the Court to provide an updated address since the only address the Court has on file is the correctional facility where he was incarcerated. Hartzog apparently lacks an interest in pursuing the lawsuit he instituted and has failed to comply with Local Rule 5.2(d), thereby frustrating the Court's ability to correspond with him. Under the circumstances here, the Court finds it would be futile to make any further attempts to contact Hartzog.

## VI.   Conclusion

For the reasons stated above, Albert Hartzog's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/ Hon. Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: May 18, 2010
Buffalo, New York.